In the Matter of **HUDSON–ROSS, INC.,**
an Illinois corporation, Debtor.
**No. 58 B 8353.**

United States District Court
N. D. Illinois, E. D.
June 30, 1959.

---

Rothbart & Rosenfield, Chicago, Ill., for debtor Hudson-Ross.

Blanksten & Lansing, Chicago, Ill., for objecting creditors Zenith Radio & Admiral.

Bruno E. Nowogrodski, Chicago, Ill., referee in bankruptcy.

LA BUY, District Judge.

The petition for review of the referee's order of April 27, 1959 raises the issue of whether the plan of arrangement, as modified, filed by the debtor under Chapter XI, 11 U.S.C.A. § 701 et seq., should be confirmed. The referee concluded that it was reasonable and in conformity with all provisions of Chapter XI of the Bankruptcy Act, and particularly § 366, 11 U.S.C.A. § 766, thereof. Objections to this confirmation are made by Zenith Radio Distributing Corporation and Admiral Distributing Corporation, creditors of the debtor.

Under the plan, all unsecured merchandise creditors, other than the ten principal unsecured merchandise creditors, were to be paid in full as Class IV creditors. The ten principal creditors were placed in Class V, to receive 35% of their May 1, 1958 claims due and unpaid, and to be paid in full for unpaid indebtednesses incurred subsequent thereto as Class IV creditors. Seven of the ten creditors whose claims aggregate $612,581.25, have accepted the arrangement; three—Admiral, Zenith and Magnavox,—whose claims aggregate $265,-466.40, have not filed acceptances. These three filed the objections which were heard, considered and overruled by the referee, who then confirmed the plan.

At the court's request briefs have been submitted on the objections relating to the arbitrary and discriminatory nature of the Class V designation.

■■ The Bankruptcy Act sanctions a division of creditors into classes and a treatment thereof in different ways or upon different terms. Such classification, however, must be necessary and proper and made on a reasonable basis in order that the arrangement be for the best interests of all creditors. Ordinarily, a creditor is not entitled to better treatment merely because he holds a small claim rather than a large one.

■ The debtor has conceded in arguments before this court that the plan would not be an appropriate classification of unsecured merchandise creditors into two groups were it not for two agreements by the ten creditors affected by the plan. The classification of these ten creditors as Class V rests upon the effect of a May 16, 1958 extension agreement and an alleged oral agreement of October 23, 1958. Both agreements relate to obligations due and unpaid on May 1, 1958 and it is with regard to that indebtedness that a distinction is made between the ten principal unsecured merchandise creditors and all other unsecured merchandise creditors.

It appears that none of the parties dispute the existence or the terms of the May agreement. That agreement, accepted by these ten creditors, was submitted by the debtor to work out a program "which in our judgment will completely liquidate our past indebtedness to you and the others of said ten largest creditors in the most expeditious manner". It was provided that the creditors would receive an initial 20% payment, based on the amounts then due, and $40,-000 each month to be proportioned among themselves; payments on new purchases were to be on terms "as may be mutually agreeable". All other creditors were to be paid as their bills matured. Upon default in payment, the creditors had a right to accelerate their indebtedness and in the event of filing of a voluntary petition for composition, the creditors had the option to terminate the agreement and it would be "considered for naught".

After making the initial 20% payment and two $40,000 payments, the debtor paid nothing to these ten creditors for the months of August, September, October and November.

The court is of the opinion that the May agreement, by its terms, contemplated that the ten creditors would be paid in full on debts owing to them for the debtor's express purpose was to "completely liquidate" their past due indebtedness "in the most expeditious manner". There is nothing contained in its provisions to indicate they were to receive less than full payment on such debts. It was on this debt that an exten-

sion of time for payment was evolved, but it was not intended that less than the full amount be paid. Such an agreement was not a composition agreement, nor did it displace the original debt. Sales by all creditors, including these ten, made after May 1, 1958 were to be on a current basis, and the fact that debtor urges that these ten were paid in full on such subsequent sales while some of the others were not does not affect the position of these creditors so far as their agreement on the May indebtedness is concerned.

The referee concluded that these ten creditors received "very substantial benefits" from their Class V classification because of the May agreement. The record, however, shows that they did not receive the full payment for their May indebtedness and have a remaining balance thereon of $877,862.93; that the other unsecured merchandise creditors of the debtor were paid in full as their debts matured and therefore received 100% payment of the indebtedness due them as of May 1, 1958; that these ten creditors received only 28% under an agreement which contemplated full payment.

To conclude that by this agreement, the ten creditors indicated an intention to be subordinated to the claims of other unsecured creditors on debts existent May 1, 1958 does violence to the language of the agreement and adds terms thereto which the parties had not intended and had not expressed. The court holds that this agreement cannot be construed to have committed these ten creditors to a Class V, or subordinate classification, and the referee's finding in that respect is clearly erroneous.

By its terms, this agreement also provided for termination at the option of any of these creditors in the event of the voluntary filing of a composition petition. While no positive exercise of such option was made, the conduct of the parties following default in the installment payments by the debtor shows a clear intention on the part of both the debtor and creditors to abandon the same. That the debtor regarded the agreement as terminated is shown by his sworn state-

ment of executory contracts filed November 18, 1958 wherein it avers that the May agreements had "by their terms expired" and that the plan of arrangement was "in lieu of and in substitution of any prior agreements or understandings with said merchandise creditors in respect of said indebtedness existing prior to May 1, 1958".

The other basis offered by the debtor to substantiate a subordination agreement results from circumstances surrounding several meetings held by these creditors some months after default in the payments under the May agreement. The referee found that on or about October 23, 1958 the ten creditors met and all agreed to accept a sum equivalent to 35% of the balances owing them on debts due May 1, 1958; that notwithstanding the oral agreement, the three objecting creditors thereafter refused to accept the settlement.

It is objecting creditors' position that no unanimous agreement could have been reached since the representatives of Zenith and Admiral attending that meeting were not authorized to accept such agreement without home office approval; that such final approval was never given. Tr. 110, 112–113, 118; 496–499, 503, 575–577. The chairman of the creditors' committee, Mr. Krause of Norge Sales, testified that no expression of lack of authority to approve was made, but did testify that final consents of Zenith, Admiral and Magnavox were not received and that the creditors' committee would not have the power to make them agree to anything. Tr. 2753–2755; 2763.

It is also contended that said oral agreement, if any, was inchoate and contemplated final written acceptance in the form of ten executed written assignments of claims; that only eight were so executed, and of these eight, one withdrew the assignment because it was sent "conditional * * * upon the acceptance of the same arrangement by all of the nine other creditors." Tr. 313, 387.

The court is of the opinion that while a discussion of a composition settlement was had among these ten creditors, no

binding agreement resulted. The lack of unanimity in oral consent is apparent from the record, and the referee's finding that all of the ten creditors consented is clearly erroneous. Further, the court is of the opinion that none of the creditors agreed to be bound unless all executed written assignments of their claims and that such execution by all ten creditors was a necessary condition precedent to a binding commitment for acceptance of either the 33⅓%, or possibly 35%, as a settlement for their claims. There exists no binding contract which compels the objecting creditors to subordinate their claims to those of other unsecured creditors.

The separation of unsecured creditors into two separate classes, Class IV and Class V, in the plan submitted by the debtor was not made on any reasonable basis and was not proper because the ten creditors cannot be held to have agreed to a subordinate creditor status, and such classification is therefore arbitrary and discriminatory. The referee's order dismissing creditors' objections directed to such classification must be overruled and set aside.

Certain additional circumstances have been revealed by the record upon which the court is compelled to make comment for they impinge upon the requisite good faith of all petitioners under the Bankruptcy Act.

The referee entered an order upon the filing of the Chapter XI petition that the debtor open a new set of books for the debtor in possession. The debtor ignored this order. This fact was not revealed to the referee until the hearings on the objections were almost completed. Section 14, sub. c of the Act provides that a court shall grant a discharge unless it is satisfied that petitioner has "refused to obey any lawful order of * * * the court". 11 U.S.C.A. § 32 (c). No satisfactory explanation has been given for the debtor's failure to obey the lawful order of the court.

Objecting creditors allege that payment of $74,541.73 was made by the debtor to unsecured merchandise creditors other than those in Class V on accounts due and existent before November 19, 1958, when the Chapter XI proceeding was filed, and that such payments constituted a preference of certain creditors over others. At the court's request the debtor submitted for its inspection certain ledger sheets for creditors other than the Class V creditors, and there was in evidence, at the referee's request after discovery that no new set of books were opened, an analysis of liabilities, purchases and payments of the debtor on October 31, 1958 and for the period November 19, 1958 to April 9, 1959. These records, and the testimony of Mr. Levin, show that payments were made after November 19th on accounts due before that date. The failure to open a new set of books after November 19 made it difficult to ascertain the exact amount of such payments.

Another incident in relation to the operation of debtor's business which merits mention is the maintenance of certain persons on the debtor's payroll who were not employees of the debtor. The debtor withheld and paid withholding tax and sent W-2 forms to seven persons listed on its payroll. Four of these persons were called by the objecting creditors and all four testified they never received any salary checks from the debtor, never endorsed any checks made payable to them by the debtor; three denied ever having performed any services for the debtor. They testified that one Harris Turner, who was not an employee of debtor, spoke to them about doing some work for him, and only one of the four testified that she did "spot" investigate certain of the debtor's stores at Mr. Turner's request and received some, but not all, money due her from Mr. Turner. Two denied ever receiving any money from Mr. Turner.

At least 114 payroll checks amounting to about $21,000 were issued to the seven individuals. These checks were delivered to Lynn Stewart, who endorsed the names of the payees thereon and cashed the checks. This evidence is not controverted by the debtor. The payroll procedure was explained on the basis that Lynn Stewart had loaned the debtor $150,000 and the services of these per-

sons were required by Harris Turner on behalf of Lynn Stewart to protect Stewart's interest. The debtor's motive in approving the devious withdrawal of $21,000 of its funds when it was unable to meet its financial obligations remains a mysterious episode in the conduct of the debtor's business for which no satisfactory explanation has been made.

The referee's order confirming the plan of arrangement is set aside and the plan is rejected and confirmation refused. The cause is referred to the referee for the purpose of complying with § 376(2) of the Act, 11 U.S.C.A. § 776(2) to determine whether the debtor should be adjudged a bankrupt or to dismiss the proceedings under this Chapter.

In order to safeguard the interests of all parties, the court further finds that it is necessary that a receiver be appointed to take custody of the assets of the debtor and to conduct and operate the business of the debtor, Hudson-Ross, Inc.

Orders in accord herewith have this day been entered and copies thereof are enclosed with this memorandum.