**In the Matter of U.S. TRUCK COMPANY, INC., Debtor.**

**Bankruptcy No. 82–03561–BE.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Sept. 7, 1984.

Joseph Radom, Southfield, Mich., for debtor.

Ronald L. Rose, and Judy A. O'Neill, Detroit, Mich., for Mich. Self-Insurers' Ass'n.

Eileen D. Zielesch, Asst. Atty. Gen., Lansing, Mich., for Mich. Self-Insurers' Sec. Fund.

## MEMORANDUM OPINION AND ORDER

STANLEY B. BERNSTEIN, Bankruptcy Judge.

ISSUE: May the Debtor include as members of a single class of unsecured creditors under its plan of reorganization persons entitled to workers' compensation benefits?

The Debtor, U.S. Truck Company, Inc., filed an amended plan of reorganization with the Court on September 7, 1983. The plan provides for a payment of 55% of the allowed unsecured claims—5% upon confirmation and the balance in ten semi-annual installments of 5%. All of the unsecured creditors with claims above $200 are included in a single class under the Debtor's plan.

The Michigan Self-Insurers' Association (MSIA) filed its written objections to confirmation of the Debtor's plan. The basic objections of MSIA are that (1) the plan has improperly classified all claims for workers' compensation benefits as prepetition claims; (2) the plan has radically underestimated the amount of workers' compensation claims and is, therefore, not feasible. The Attorney General of Michigan has joined in MSIA's objections on behalf of Michigan Self-Insurers' Security Fund.

After an extended hearing on the arguments of counsel, the objections to the plan relating to the workers' compensation benefits were adjourned so that the parties could develop the relevant data on the number of U.S. Truck employees who are entitled to receive benefits, and the magnitude of the claims to such benefits. After the Attorney General and the Debtor submitted initial summaries of the data on benefits, an evidentiary hearing was held to explain to the Court how the administrative system of workers' compensation benefits operates in Michigan for self-insured employers like the Debtor and how benefits are determined and allocated to accounting periods as a matter of Michigan state law and administrative practice.

Testimony was given by John P. Miron, the Chief Deputy Director of the Michigan Workers' Compensation Bureau and a former president of the International Association of Industrial Accident Bureaus and Commissions. Mr. Miron testified as a qualified expert on the fundamental concepts of workers' compensation law and administration in Michigan and more particularly on the self-insurance sub-system. Testimony was also given by Gary Caulkins, an employee of the Michigan Workers' Compensation Bureau, who is responsible for the administration of the self-insurance program and, in particular, understands the Debtor's history of performance as summarized in detailed exhibits admitted into evidence.

## I. THE POSITION OF THE PARTIES

At bottom, the dispute between the Debtor and the objecting parties is based upon radically different conceptions of how workers' compensation benefits may be treated as claims under the Bankruptcy Code and under a plan of reorganization. The Debtor treats all claims for benefits as arising from the date of a work-related injury, and if the injury occurred on a date prior to the petition, as a pre-petition unsecured claim. As such, the Debtor proposed to treat those claims like all other pre-petition claims and pay them at the rate of 55% of the claim dollar.

Consistent with that view, the Debtor stopped paying all disability benefits after it filed its petition. Under state law, benefits are payable weekly to disabled employees. The practical consequence of this decision was to deprive disabled employees of all benefits—a business decision so fundamentally lacking in human decency as to be morally reprehensible. In the history of Chapter 11 cases filed in this district, no Debtor ever provided for impairment of workers' compensation disability claims in any proposed plan or reorganization. From either indifference or, less likely, embarrassment, the disclosure statement accompanying the plan is completely silent on the issues of the treatment of compensation benefits. Fortunately, for the affected employees, the Administrator of the Michigan Self-Insurers' Trust Fund advanced disability payments on the magnitude of $500,000.00 directly to these employees. The Fund will be submitting a request for payment of administrative expenses to recover these advances.

The Debtor's initial position was that the indebtedness to these disabled employees stopped accruing on the date of the petition so that the allowable claims were limited to

accrued benefits to that date. That would have led to the denial of any liability to pay as an administrative expense the advances made by the Fund for benefits payable after the date of the petition. Presumably, the Debtor would have characterized the Fund as a volunteer for $500,000.00.

As discussed below, the Debtor changed its initial position during the continued hearings on the scope and treatment of claims for unpaid disability benefits. The Debtor, however, continues to assert that all payments due to holders of these claims are to holders of unsecured, pre-petition claims.

The objecting parties took a much more sophisticated, perhaps too sophisticated, view of worker's compensation benefits. They argued that under the Workers' Disability Compensation Act of 1969 in Michigan, M.C.L.A. §§ 418.101, et. seq., (Compensation Act), an employee who suffers a wage loss attributable to a disability arising from a work-related injury is entitled to be paid *weekly benefits*, and that the right to payment of those weekly benefits *accrues each week*. In a word, there is no single pre-petition claim, but instead a series of discrete claims, arising each week, so long as the disability continues. The objecting parties stressed that the weekly amount of benefits may be increased, decreased, terminated, or reinstituted depending on the changing character of the disability as it directly affects the worker's ability to perform his or her original job.

Applying the Bankruptcy Code to workers' compensation benefits, the MSIA argued that a disabled worker could, in one formulation, have a successive series of different types of unpaid claims over time: a pre-petition general unsecured claim, a priority unsecured claim, and an administrative claim.

The MSIA further argued that the weekly benefits which are payable after confirmation of the debtor's plan are not discharged because they are not claims as defined under the Bankruptcy Code. That argument is based on a technical construction of a claim as a "right to payment"

under 11 U.S.C. § 101(4)(A). The right to payment refers to liabilities that arise prior to the petition and during administration of the case. If the right to payment of weekly benefits arises after confirmation, then MSIA's position has validity. MSIA's position is internally consistent, for the overriding concept is that under state law each week of disability gives rise to a discrete right to a weekly payment.

The Debtor's plan apparently recognized only the accrued unpaid disability benefits as of the date of its petition. All obligations after that date cease.

In reply, MSIA argued that if all benefits are terminated by the filing of the petition, and recovery from the Debtor as employer is lost, then disabled employees have no remedy whatsoever because workers' compensation benefits are an exclusive remedy for work-related injuries and resulting disabilities. That would be a horrendous result.

## II. THE OPERATION OF THE COMPENSATION SYSTEM

Under the Compensation Act, the administrative law judge enters an "open award" awarding payment to the disabled employee in a fixed weekly amount, if the judge is satisfied that the disability is continuing. The amount of the award is based upon the weekly wage of the employee as of the *date of injury*, the number of dependents, and the amount of the wage loss attributable to the disability. The amount of the weekly benefit cannot exceed two-thirds of the wage loss—the difference between what was earned and what the disabled employee can now earn. The award is said to be "open" until further order of the Bureau. The award of weekly benefits can be terminated upon the employer's "petition to stop" if the wage loss can be eliminated due to the workers' recovery, or can be increased upon the employee's "petition to reopen" if the wage loss is increased because the disability has become more severe. Although these adjustments may be made to an "open award," the MSIA has strained the logic of an award to character-

ize the benefits as accruing *anew* each week because the amount of the award can be modified.

In support of the idea that the date of injury is critical to the administration of the workers' compensation system, the Chief Deputy Director testified that for a self-insured employer all payments of benefits under an open award are allocated to the period of insurance coverage which includes the date of injury. Thus, if a $150,-000.00 award is paid to a disabled employee over the course of his open award, and the injury occurred in May of 1978, the entire $150,000 is allocated to the policies in effect that month. To avoid confusion, one should note that a self-insured employer still has to obtain private insurance for a substantial portion of its exposure to workers' compensation claims. The employee may "self-insure" only for the first dollars of liability; after that ceiling is reached, private insurance from a carrier has to be made available.

After considering the expert testimony of the Chief Deputy Director of the Workers' Compensation Bureau, the Court is satisfied that the Debtor is correct in emphasizing as the controlling event the pre-petition date of injury for purposes of both state and federal-bankruptcy law. Several courts have considered the status of unpaid workers' compensation claims. In a matter decided under the Bankruptcy Act of 1898, as amended, Bankruptcy Judge Brody held in an unreported decision that claims for workers' compensation benefits arising from pre-petition injuries were to be treated as general unsecured claims.

Any surety for a self-insured employer who paid benefits to injured employees under its bond was deemed subrogated to the rights of those employees. As such, the surety would be reimbursed on a pro-rata basis with all other allowable general unsecured claims. The fact that the payments made by the surety may have been for benefits accruing after the debtor's bankruptcy petition was filed did not entitle the surety to be reimbursed as a creditor who extended credit to the debtor during the administration of the bankruptcy case. All benefits paid related back to the date of injury. Thus, the surety's request for priority status was denied. The district court affirmed Judge Brody's opinion. *In re Transamerican Freight Lines, Inc.,* 4 Bankr.Ct.Dec. (CCR) 82 (E.D.Mich.1978). The district court noted that a contrary holding by Bankruptcy Judge Galgay, *In re REA Express, Inc.,* 2 Bankr.Ct.Dec. (CCR) 337 (Bankr.S.D.N.Y., 1976), was reversed by the district court, 442 F.Supp. 71 (S.D.N.Y.1977), affirmed, 591 F.2d 1331 (2d Cir. 1978). Under the Code, *In re Columbia Packing Co.,* 34 Bankr. 403 (Bankr.D.Mass. 1983) follows these holdings of the appellate courts. None of the opinions other than Judge Galgay's clearly focuses on the problem of post-petition accruals of benefits arising from pre-petition injuries—the necessary implication of these opinions is that all benefits relate back to the date of injury, no matter when the periodic payment becomes due. Under the Code, the Court would presumably have to estimate the amount of the claim for purposes of allowance under 11 U.S.C. § 502(c) by discounting to present value the payments which would be made under an open award. That would, no doubt, be very difficult. But the estimation does not alter the "prepetition" status of the claim.

### III. CLASSIFICATION OF CLAIMS REVISITED

The Debtor conceded during the evidentiary hearing on the objections that it was now prepared to pay 55% of the weekly disability benefits arising from pre-petition injuries throughout the period of the open award. Once the Debtor has made that concession, it follows that the Debtor had improperly classified pre-petition trade claims and "pre-petition" disability claims as comprising one class. For under the plan, a trade creditor with a $100,000 allowed claim would receive a total of $55,-000 in eleven semi-annual installments of $5,000, and a partially disabled employee with an open award of $100 a week would receive $55.00 each week for the duration

of his or her award. Quite clearly, the terms of payment to these two types of pre-petition creditors are substantially dissimilar. The trade creditor has a claim for unpaid goods or services supplied during the pre-petition period—the transaction is closed; the disabled employee may have suffered an injury during the pre-petition period, but there the similarity between the two creditors stops abruptly—the disabled employee's transaction is not closed; it may continue for the duration of his or her lifetime.

Nor may the Debtor treat the disabled employee as analogous to a tort victim who suffered an injury at the workplace. There is no lump sum judgment for damages possible under the workers' compensation system of "open awards." Only in the limiting circumstance of a "redemption" of a claim is there ever a lump sum payment, and that requires an informed consent of the disabled employee, the employer, and a finding by an administrative law judge that such a "redemption" is, among the several statutory criteria, in the best interest of the employee. Absent a redemption, the administrative law judge can only enter an open award to an employee with a continuing disability. To be sure, one could resort to complex actuarial assumptions and discount an open award to a present value, but that is inconsistent with the law of workers' compensation in Michigan; moreover, there is nothing contingent about an open award—the liability and amount is fixed, undisputed, and liquidated. So estimation under 11 U.S.C. § 502(c) would be improper. And the Debtor has conceded as much—it is now prepared to pay 55% of the weekly benefit amount as each payment becomes due.

In light of the foregoing, the Debtor's plan cannot be confirmed because it has violated the provisions of 11 U.S.C. § 1122(a). That section requires that "a plan may place a claim or an interest is substantially similar to the other claims or interests of such class." The Debtor has included substantially dissimilar claims—trade claims and workers' compensation claims—in the same class. Because the classification is improper, the provisions of 11 U.S.C. § 1129(a)(1) is violated—the plan cannot be confirmed because the plan does not comply with an applicable provision of Chapter 11 of the Code, to-wit: 11 U.S.C. § 1122(a). The objecting creditors' other objections as to feasibility do not have to be considered.

## IV. CLASSIFICATION

The statutory criterion under review is that each claim be included in a class of claims such that each claim in the class is "substantially similar." The working assumption held by most bankruptcy practitioners, judges, and commentators is that all unsecured claims must be included in a single class with the limited exception under 11 U.S.C. § 1122(b) for claims in modest amounts which for "administrative convenience" may be separately classified for more favorable treatment. The rationale supporting this working assumption is that ultimately an unsecured claim is defined by its relative priority position in a liquidation scheme. This rationale is stated succinctly in 3 *Norton Bankruptcy Law and Practice*, Part 60—Page 7 as follows:

"360.05. Unsecured Claims.

Unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or *a deficiency of a secured creditor*. These unsecured claims have in common the fact that their remedies against the debtor are the same and the non-priority unsecured creditors are entitled to share pro rata in values remaining after payment of secured and priority claims."

This line of analysis was explicity adopted by the court in *In re Pine Lake Village Apartment Co.*, 19 Bankr.Rptr. 819 (Bankr.S.D.N.Y.1982). *See* also *In re S & W Enterprise*, 37 Bankr. 153 (Bankr. N.D.Ill.1984). In the *Pine Lake* case, the bankruptcy court stated its opposition to the designation of two separate classes of unsecured claims, one class consisting of a single claim based upon a deficiency on an undersecured mortgage indebtedness in ex-

cess of $4,000,000 and a second class of unsecured trade creditors whose claims in the aggregate totalled $44,952.06. Creditors in the second class were to be paid in full upon confirmation; the first class was to be paid substantially less than the allowable amount of its claim. The second class would not be impaired under 11 U.S.C. § 1124 and as such would be deemed to have accepted the plan under 11 U.S.C. § 1126(f). By virtue of the acceptance, the plan would satisfy a critical element for confirmation, namely, 11 U.S.C. § 1129(a)(10) which requires that at least one class accepts the plan.

The *Pine Lake* court took the initial position that the designation of the second class was wholly manipulative—had there been one class, and the deficiency claim were included, 11 U.S.C. § 1129(a)(10) would not have been satisfied because the under-secured creditor would have voted against acceptance and the required dollar amount of voting claims needed for acceptance could not be obtained. By this manipulation, the debtor sought to neutralize the voting power of the under-secured creditor.

The *Pine Lake* court did not have to, and did not ultimately, rely upon this analysis. The classification argument proved to be a red herring because the court relied upon 11 U.S.C. § 1129(b)(2)(B)(ii), the cram-down section as it pertains to a non-accepting class of impaired creditors. The debtor could not retain its interest in the mortgaged premises in the face of rejection of the plan by the mortgagee. That rejection would occur whether the deficiency claim occupied its own separate class or dominated the class of all unsecured creditors. At bottom, the mortgagee could not be crammed-down.

This Court would follow the thrust of the *Pine Lake* court's opinion on the cram-down issue, and would also concur on the specific application of the classification objection to the deficiency claim. But that court asserts too broad a position on classification. The statute does not say that all unsecured claims are of the same nature. Nor is an analysis based upon a distribution scheme in Chapter 7 controlling in Chapter 11 proceedings. It is not necessarily the case that a classification of claims must be developed solely with a Chapter 7 distribution scheme as the source of specifying the relevant criteria. The Aristotelian exercise in determining the *nature* of claims and the criteria of "substantial similarity" is far more difficult and elusive.

The *Pine Lake* court is properly concerned with preventing abusive manipulations of the voting rules on acceptance. But there are all sorts of other abuses which the *Pine Lake* court ignores. It is just as easy to hypothesize a Chapter 11 case in which a discrete sub-class of unsecured claims was intentionally included within a more inclusive class to deny that sub-class any vote on a plan. Must we forget majority tyranny of an "insular minority?" In a word, an analysis that "all unsecured claims are equal" is simplistic and mischievous. There is surely no satisfactory *a priori* rule that some types of unsecured claims may not be "substantially similar." Yes, one has to be concerned that one does not unleash the proliferation of nuclear weapons in the world of bankruptcy. There have to be meaningful controls against unleashing myriad separate classes of unsecured claims. But it is too early in the history of the Code to lock all non-nuisance unsecured claims in a single cell. The Code does not require such a lock-up.

Indeed, under the Bankruptcy Act of 1898, as amended, bankruptcy courts confirmed plans of arrangement in Chapter XI proceedings in which more than one class of unsecured claims had been established. *See In re Hudson-Ross, Inc.*, 175 F.Supp. 111 (N.D.Ill.1959) and *In re KDI Corp.*, 477 F.2d 726 (6th Cir.1973). Ultimately the control against abuse is to deny confirmation because the plan is not propounded in good faith, but short of that a plan may be struck when the classification is improper. Generally, courts have struck plans or denied confirmation when the debtor has formed more than one class of unsecured creditors. In this case, the Court has determined to strike a plan because the Debtor has failed to form separate classes.

At this juncture this Court is reasonably satisfied that the claims for unpaid weekly workers' compensation disability benefits are materially *dissimilar* in *nature* to justify a separate classification. There are salient *legal* characteristics of these claims that justify different classification and treatment under a plan. In the most important respect, these ·claims are "open ended" in character. The language of the state law is illuminating—the awards are *open* as opposed to closed. Pre-petition claims arising out of ordinary contractual relationships are closed—they have occurred and the damages are measurable (or estimatable). The workers' compensation claim share the important characteristics under the state act that the date of injury, a pre-petition event, is controlling for most purposes—establishing the average weekly wage, the number of dependents, the identity of the employer, and the adversely affected type of work. But the administrative treatment of these claims is also different in other critical respects, and therein lies the rub.

The Debtor's plan of reorganization is struck as nonconfirmable.

IT IS SO ORDERED.