**In re NORTHEAST DAIRY COOPERATIVE FEDERATION, INC., Debtor.**

**Bankruptcy No. 85–00721.**

United States Bankruptcy Court,
N.D. New York.

Jan. 23, 1987.

See also, Bkrtcy., 72 B.R. 663.

Arter & Hadden, Columbus, Ohio (Grady L. Pettigrew, Jr., of counsel), Proskin & Lavigne, P.C., Albany, N.Y. (Debra A. Kaelin, of counsel), for National Farmers Organization, Inc.

Hancock & Estabrook, Syracuse, N.Y. (James J. Canfield, Donald J. Kemple, of counsel), for debtor.

Menter, Rudin & Trivelpiece, P.C., Syracuse, N.Y. (Peter L. Hubbard, of counsel), for Creditors' Committee.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING DEBTOR'S SECOND AMENDED PLAN OF ·REORGANIZATION

STEPHEN D. GERLING, Bankruptcy Judge.

Northeast Dairy Cooperative Federation, Inc. ("Nedco") filed its petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101–15326 ("Code") on August 30, 1985. On June 2, 1986, Nedco filed its Second Amended Disclosure Statement ("Amended Disclosure") and Second Amended Plan of Reorganization ("Plan"). The Amended Disclosure was approved by the Court on June 9, 1986.

On September 29, 1986, the National Farmers Organization, Inc. ("NFO"), the holder of an unsecured claim, and a member of the Official Committee of Unsecured Creditors ("Committee"), filed its objections to confirmation of the Plan. Pursuant to Code § 1128, a confirmation hearing was held on December 3, 1986, at which time both Nedco and NFO offered the testimony of witnesses and introduced exhibits, and all parties hereto were afforded an opportunity to cross-examine. By stipulation of the parties, the hearing on Plan confirmation preceded the hearing on NFO's written objections. Nedco, as Plan-

proponent, NFO, and the Committee have all since submitted briefs on the issues raised by the written objections and at the confirmation hearing. Upon review of the entire record and evidence, and having considered the thoughtful arguments of counsel, the Court renders the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Bankr.P. 9014 (Fed.R. Bankr.P. 7052).

### FINDINGS OF FACT

Nedco has continued to operate its business as a debtor-in-possession pursuant to Code §§ 1107 and 1108 since the filing of its bankruptcy petition. Nedco is a federation of cooperatives organized and existing under Article 2 of the New York Cooperative Corporation Law (McKinney 1951).

The Amended Disclosure reveals that Nedco's assets consist primarily of monies collected on accounts (currently deposited in various banking institutions) aggregating in excess of $1,300,000.00. Nedco retains real property with an estimated approximate market value of $800,000.00. Accounts receivable in excess of $15,000,-000.00 are susceptible to possible offset, and hence a precise figure is unavailable.

Specifically not taken into account as assets available for liquidation and distribution are sums which may be due Nedco from dairy farmers and producers ("Producers"), under certain "Loss Allocation Programs" for the years 1984 and 1985. The 1984 Loss Allocation Program required Producers to fund Nedco's "current losses". This arrangement was apparently superceded by the 1985 Loss Allocation Program which required each Producer to contribute his pro rata share of any "loss" sustained by Nedco after October 31, 1984. The Amended Disclosure indicates Nedco sustained an operating loss of $8,687,078.00 for the fiscal year ending March 31, 1985, and a total loss (consisting of asset write-down and increased bad debt reserve) of $20,490,274.00.

Nedco owes the holders of general unsecured claims the aggregate sum of $29,-093,995.00. This figure does not factor in Nedco's ability to offset certain amounts, particularly under the Loss Allocation Programs. For example, the Amended Disclosure states Nedco owes the Producers the aggregate amount of $15,946,404.00 for milk purchases, together with payments the Producers may have paid to Nedco under the 1985 Loss Allocation Program (as if these latter amounts were claims against the estate).

The Amended Disclosure divulges Nedco and the Committee's concern with the enforceability of both the 1984 and 1985 Loss Allocation Programs, as well as other capital programs instituted by the Debtor. The document includes recapitulations detailing three possible scenarios resulting for creditors were the various interests under these agreements contested in a legal forum. First, were the 1984 and 1985 Loss Allocation Programs enforced to the extent of Nedco's "total loss", various Producers and Member cooperatives of Nedco would owe the Debtor the aggregate approximate sum of $8,548,886.00. Second, if the agreements were enforced to the extent of the Debtor's "operating loss", Nedco would owe its Member cooperatives the aggregate approximate sum of $3,254,188.00. Third, were the 1984 and 1985 Loss Allocation Programs not enforced except to the extent paid in, Nedco would owe various Member cooperatives an approximate aggregate sum of $12,993,030.00.

The Amended Disclosure exposes the conflict and tension between three types of creditors; non-Producer creditors, Producer creditors, and/or Member Cooperatives. If future litigation resulted in a determination that the Loss Allocation Programs were enforceable to the extent of Nedco's "total loss", as well as losses post-March 31, 1985, most Producers and/or Member cooperatives would be debtors of Nedco. Were Producers, as member/owners of Nedco's Member cooperatives held to be Nedco's "true" owners, it is unlikely that non-Producer creditors (generally Nedco's trade creditors), would permit distribution to the Producers until their claims had been paid in full. On the other hand, litigation could result in a determination that Producers claims based upon milk sales to Nedco

were arms-length transactions, placing these claims on a level with non-Producer claims. Further, the 1984 and 1985 Loss Allocation Programs could be held invalid and unenforceable, entitling Producers to claims for payments and deductions previously made to Nedco.

The Amended Disclosure details the attempts of Nedco and the Committee to strike the middle ground between these conflicting and uncertain creditor interests, short of the anticipated protracted litigation. The Plan consequently provides for enforcement of the 1984 and 1985 Loss Allocation Programs to the extent of a "compromise loss" figure of $7,495,380.00. Additionally, the Plan partially subordinates the Producer claims to non-Producer claims, with equal sharing of those distributable proceeds in excess of $4,000,-000.00. Nedco contends the Plan's compromise solution results in substantial savings to the estate for it avoids the considerable expenditures associated with a litigated solution to the conflicting interests. Nedco believes enforcement of the 1984 and 1985 Loss Allocation Programs to the extent of "total loss" to be impractical, referencing the cataclysmic impact such a holding would have upon Producers and/or Member cooperatives. The proposed "compromise loss" is approximately 92% of Nedco's "operating loss" for the fiscal year ending March 31, 1985, when the partial subordination scheme, more fully described below, is factored into the equation. Enforcement of the 1984 and 1985 Loss Allocation Programs to the extent of the "compromise loss" results in Nedco owing an approximate aggregate sum of $4,445,938.00 to Producers and/or Member cooperatives on behalf of Producers.

1. The Initial Payment Date is defined in the Plan as the tenth (10th) business day, or as soon as practical thereafter, following the date upon which a Confirmation Order becomes a Final Order.

2. "Class Three Distributable Proceeds" are defined as the dollar amount equal to 70% of Distributable Proceeds up to $4,000,000.00, together with 50% of Distributable Proceeds in excess thereof. Class Three Distributable Pro-

The Plan provides for the substantial liquidation of Nedco's assets and subsequent distribution to creditors. Excepted from the liquidation will be Nedco's present office equipment and supplies. Nedco intends to provide future services as a bargaining cooperative for Member cooperatives and Producers, as well as provide market-wide administrative and educational services.

Under the Plan, creditor claims are grouped into six classes. Class One consists of the holders of claims for administrative and allowed priority expenses. Class One is to be paid in full in cash on the Initial Payment Date[1] or upon entry of a Final Order allowing the claims, whichever is later. Nedco asserts that Class One is unimpaired under the Plan.

Class Two consists of the holders of unsecured claims of less than $1,000.00 in amount. Payment to Class Two claimants is proposed on the same terms as Class One, and Nedco likewise asserts that Class Two is unimpaired.

Class Three consists of the holders of unsecured non-Producer claims equal to or greater than $1,000.00. The Amended Disclosure estimates these claims aggregate approximately $8,000,000.00. Class Three claims as a whole are to be paid the sum of their pro rata share of 70% of the first $4,000,000.00 (in excess of payments due Class One and Two claims) generated by asset liquidation. In addition, Class Three claims as a whole will be paid the sum of their pro rata share of 50% of available liquidation proceeds in excess of $4,000,-000.00, if any. The Plan provides for payment of Class Three allowed claims on the twenty-fifth (25th) day after the Initial Payment Date in an amount equal to their pro rata share of the Class Three Distributable Proceeds[2] as of the date after satis-

ceeds are to be modified in proportion to any increase/decrease in the ratio of aggregate Class Four allowed claims to Class Three allowed claims in relation to the estimated Class Four allowed claims to estimated Class Three allowed claims.

"Distributable Proceeds" are those proceeds available after payment of allowed Class One and Two claims, and settlement of liquidation expenses.

faction of the Class One and Class Two claims. Nedco intends to reserve from such payments sums which might be allowable for any Disputed Claims[3] until the same are resolved. As additional Class Three Distributable Proceeds become available, Class Three claimants will receive their pro rata share thereof. Finally, Class Three claims will be paid an amount equal to their pro rata share of 70% of $50,000.00 in four equal "quarterly" installments on January 1, April 1, and July 1, 1987, and January 1, 1988, with interest thereon at ten per cent (10%) per annum. Nedco asserts that Class Three is impaired pursuant to Code § 1124.

Class Four consists of the holders of allowed Producer claims, after taking into consideration the enforcement of the 1984 and 1985 Loss Allocation Programs, as well as those capital commitments set forth in the recapitulations of the Amended Disclosure, to the extent of the "compromise loss". The Amended Disclosure estimates these claims to aggregate approximately $6,000,000.00. Class Four claims are to be paid on the twenty-fifth (25th) day after the Initial Payment Date in their pro rata share of the Class Four Distributable Proceeds[4] as of the date after satisfaction of the Class One and Class Two claims. Funds which might be allowable for Disputed Claims will be reserved. Class Four claims will be paid their pro rata share of Class Four Distributable Proceeds as they become available. Class Four claims will also receive an amount equal to their pro rata share of 30% of $50,000.00 in four equal "quarterly" installments (with interest thereon at ten per cent (10%) per annum) on the same dates as set forth for Class Three Claims. The payments to be made on Class Four Producer claims will be paid to the Member cooperative to which the Producer was or is currently a member. If

a Member cooperative is no longer in existence, or if a Producer was never a member of a Member cooperative, then payments will be made to a disbursing agent approved by the Court at confirmation. Nedco asserts that Class Four is an impaired class pursuant to Code § 1124.

Payments on both Class Three and Four claims will remain affected so long as there remain outstanding Disputed Claims in either class. As noted above, reserved from the pro rata payments on either Class Three and Class Four claims are amounts for Disputed Claims which would be paid if such claims were allowed. These amounts are included in computations determining pro rata share payments, and are to be held by Nedco in a segregated interest bearing account pending resolution of the Disputed Claim. If a Disputed Claim in either Class Three or Four is allowed in whole or in part, Nedco will pay the holder thereof immediately, including interest gained thereon while held in the segregated account. The proceeds of disallowed claims, together with the appropriate interest thereon, will be distributed to the Class Three and Four claimants as set forth above.

Class Five consists of the Member cooperatives holding the common stock of Nedco. Distribution of any profits shall not be made to claimants therein until the Plan is completed. Like Classes Three and Four, Class Five is alleged to be impaired.

Class Six consists of the holders of claims arising from Nedco's issuance of Preferred Stock, Certificates of Equity, and Certificates of Indebtedness. Confirmation of the Plan will cause these documents to be cancelled immediately, with no payment made to the holders thereof. Obviously, Class Six is impaired.

---

3. "Disputed Claims" means (a) claims (other than allowed claims) scheduled as disputed, contingent or unliquidated, or (b) claims filed pursuant to Code § 501(a) to which an objection has been timely interposed, and which remain unresolved pending entry of a final order.

4. Class Four Distributable Proceeds are defined as the dollar amount equal to 30% of Distributa-

ble Proceeds up to $4,000,000.00, together with 50% of Distributable Proceeds in excess of that figure. Class Four Distributable Proceeds are to be modified in proportion to any increase/decrease in the ratio of aggregate Class Four allowed claims to Class Three allowed claims in relation to the estimated Class Four allowed claims to estimated Class Three allowed claims.

As indicated, the Plan proposes Nedco's orderly liquidation of its assets, an activity primarily entailing the collection of accounts due for goods sold or leased, or services rendered. The Plan authorizes Nedco to commence or continue appropriate litigation in this regard. Settlement parameters require notice to the Committee, and subsequent Court approval, if Nedco seeks to settle any account in an amount less than $5,000.00 for less than 50% thereof, or any account in excess of $5,000.00 for less than 75% thereof.

The Committee is to be retained until full payment of the amounts due Classes Three and Four are made under the Plan. Further, the Court retains jurisdiction of the proceedings pursuant to Code § 1123(a)(5), (b)(3), (4), and (5), and § 1142(b).

Two objections to confirmation of the Plan had been filed with the Court prior to the hearing on confirmation, with that of H.P. Farmers Cooperative, Inc. being withdrawn. In its initial written objection filed September 29, 1986, NFO asserts: 1) claims are improperly classified; 2) the Plan is not in the best interests of creditors; 3) the Plan's proposed compromise of litigation is not in the creditors' best interests; 4) Nedco is not committed to a definite payment schedule; and 5) the Plan results in the wrongful renunciation of the 1984 and 1985 Loss Allocation Programs which Nedco allegedly used to induce NFO to extend credit. In addition, NFO's post-confirmation memorandum alleges Nedco failed to carry its burden of proof under Code § 1129.

James G. Patsos ("Patsos"), Nedco's president, testified that claims against the estate had been placed in classes with others of their ilk. Patsos stated the placement of general unsecured claims of less than $1,000.00 in Class Two was done for purposes of administrative convenience; all other general unsecured non-Producer claims had been placed in Class Three. The Plan indicates which classes are either impaired or unimpaired, with Classes One and Two being the only unimpaired classes. Patsos testified the Plan did not differentiate in its treatment of claims within the same class. Patsos reviewed the terms of the Plan's implementation, and believed the provisions sufficient for the task of the Debtor's substantial liquidation. Nedco's intentions make future liquidation or financial reorganization highly unlikely.

Patsos reiterated that the Amended Disclosure had been confirmed by the Court on June 9, 1986. He testified that Nedco was not a stockbroker, commodity broker, or railroad; nor was it a regulated entity. Further, no other regulating commission had jurisdiction over rates charged by Nedco.

Patsos disclosed that Nedco's current officers and directors would remain in their positions following confirmation, at the same basis of pay as at present. Patsos testified that the Plan provided for all payments to be made to creditors, and identified those payments which would be made without Court approval. Patsos additionally testified concerning the ballots filed by members of the classes deemed impaired under the Plan, referring to recapitulations of the ballots cast by each class.[5]

In Class Three, 98.4% (123 of 125) of the ballots cast, representing 81.4% ($4,070,239.00 of $6,226,422.00) in dollar amount voted to accept the Plan. In Class Four, 94.65% (1,468 of 1,551) of the ballots cast, representing 96.54% ($11,514,780.00 of $11,927,915.00) in dollar amount voted to accept the Plan. In Class Five, 90.48% (19 of 21) of the ballots cast by voting common stock claimants voted to accept the Plan. In Class Six, 89.52% (2,067 of 2,309) of the ballots cast, representing 80.72% ($3,628,258.00 of $4,495,099.00) in dollar amount voted to accept the Plan. Patsos testified that no claimants qualified as "insiders" of Nedco, as that term is defined at Code § 101(28).

5. On December 8, 1986, subsequent to the confirmation hearing, Patsos filed his affidavit and certification regarding the ballots cast. Thereto, he attached corrected recapitulations, the figures of which are used in this decision. The corrections were merely computational, and do not alter the substantive finding that the minimum percentages of acceptance have been met.

Patsos opined that under the Plan, the value of property to be received by the holder of each allowed claim was not less than that which would be received if Nedco were liquidated under Chapter 7 of the Code. He stated that Nedco had proposed the Plan in good faith, and that all applicable provisions of the Code had been complied with.

On cross-examination, Patsos agreed that NFO was not a Member cooperative of Nedco, and that it was possible for debts incurred by Nedco in 1983 and 1984 to be provided for in the Plan. Patsos reiterated that NFO's claim had been placed in Class Three, with payment on the claims in this class to be timely made unless there were "disputes" which could delay payment. Patsos believed prompt resolution of "disputes" to be in Nedco's best interests, and noted the Debtor would establish the interest bearing account for disputed claims. Nedco admittedly was the entity determining whether a claim was "disputed", yet the Plan proposed a method of resolution and payment over which the Court maintained jurisdiction.

Charles Reddington ("Reddington"), Nedco's Comptroller, testified he was responsible for the Debtor's books and records, yet was not a corporate officer or director. During the portion of the hearing concerning NFO's objections, Reddington stated that in September, 1984, Nedco adopted a Loss Allocation Program to recoup an "operating loss" previously sustained and apparent on the Debtor's March 31, 1984 financial statements. In general terms, the Loss Allocation Program required Member cooperatives and Producers to pay in as capital an amount assessed per hundred weight of milk sold to Nedco. In order to maintain a continuing business relationship with its trade creditors, Nedco promulgated a letter in October, 1984 detailing its efforts to cure the $3,000,000.00 "operating loss" (then carried on the Debtor's books as a "Cumulative Retained Deficit") with the enactment of the Loss Allocation Program.

One of the recipients of the October correspondence was NFO. Some time in the Spring of 1985, Reddington met with David J. Schwerz ("Schwerz"), NFO's Manager of Dairy Credit, to discuss Nedco's financial security. Just prior to this meeting, checks drawn by Nedco had been returned due to insufficient funds. This problem was the result of the Irving Trust Company's refusal to extend Nedco's line of credit, yet had been speedily rectified by new financial arrangements with Citicorp. However, this situation had sent tremors throughout the dairy industry, raising questions of Debtor's financial viability.

Reddington and Schwerz discussed the Loss Allocation Program, as NFO was then extending a line of credit to Nedco for milk sales. The business relationship between NFO and Nedco for the sale of milk had commenced sometime in March, 1983. Reddington stated that NFO's deliveries of milk to Nedco, as well as deliveries of milk from other sources, were very important to the Debtor, and that he certainly would not have taken steps which would have jeopardized the continued flow. While other trade creditors of Nedco had been made aware of the Debtor's enactment of the Loss Allocation Program, (some even requesting copies thereof), there were those (e.g. Niagara Mohawk) to which Nedco did not send the October, 1984 correspondence. At the time of Schwerz's visit, other trade creditors which sold milk to Nedco, in addition to NFO, had also expressed concern with the Debtor's continued financial viability.

Donald M. Hunt ("Hunt"), a certified public accountant and chairman of the Committee, testified the primary creditor concern during the course of the Committee's meetings had been the determination of the enforcement of the 1984 and 1985 Loss Allocation Programs. These agreements had failed to define what was meant by the term "loss", and thus the Committee faced serious questions on the ultimate legal impact of these agreements upon claims in general. Hunt stated that NFO, as a member of the Committee, first raised the issue of separate classification for its claim in June, 1985, after a number of meetings had already been held on the complex and unresolved issues; Hunt admitted

however, that as early as April, 1985, NFO's Committee representative had indicated she had no authority to vote on a Committee proposal to classify NFO's claim in Class Three.

Thomas E. Hoffmeister ("Hoffmeister"), a partner in the accounting firm of Price, Waterhouse (the Committee's official accountants) testified the Plan proposed the "compromise loss" because the use of the term "loss" in the 1984 and 1985 Loss Allocation Program agreements was susceptible· to wide ranging interpretation. Hoffmeister reviewed the difference between "total loss" and "operating loss" as set out above, and the impact of each definition on creditor claims. The "compromise loss" figure, when coupled with the partial subordination of Class Four claims to Class Three claims, resulted in enforcement of the 1984 and 1985 Loss Allocation Programs to the extent of nearly 92% of Nedco's "operating loss" for the fiscal year ending March 31, 1985. Hoffmeister stated the Plan's $4,000,000.00 distributable asset figure, over which both Class Three and Class Four share equally, had no special significance. It was merely a figure arrived at during negotiations.

Richard Hoffman ("Hoffman") formerly the Director of NFO's Northeast Region, testified that NFO acts as a bargaining agent for the sale of its member's milk. NFO's arrangement with Nedco for the sale of its milk required the Debtor to make payment in the month after delivery. In February, 1985, Hoffman had a conversation with a Nedco representative, Dean McCormick, concerning the Loss Allocation Programs; McCormick told Hoffman that in the future, NFO could expect to be paid promptly and in full due to the enactment of these agreements. Had McCormick not made these representations, Hoffman stated that NFO would have stopped delivering its milk to Nedco. Nedco did not seek or enter into a security agreement with Nedco for payment, nor did Nedco enter into any subordination arrangement with other of Nedco's creditors which would have bettered its collection posture.

Schwerz, a certified public accountant, testified that in December of 1984, he became concerned with Nedco's solvency after reviewing Debtor's financial statements for the fiscal years ending 1982, 1983, and 1984, and learning of the exodus of Member cooperatives from Nedco. Some of Schwerz' concerns had been met when Nedco implemented the Loss Allocation Programs and other capital contribution programs, for these appeared to rectify past losses, and cover any future losses.

In May, 1985, Schwerz met with Reddington and McCormick as a result of Nedco's request to increase its line of credit with NFO. Schwerz raised the concerns over Nedco's loss of member cooperatives, its pattern of past losses, and anticipated credit worthiness. Nedco's representatives told Schwerz that as long as Member cooperatives stood behind the Loss Allocation Programs, trade creditors such as NFO had "nothing to worry about". Thereafter, based on Schwerz' recommendation, NFO did not increase its line of credit to Nedco, but did increase the amount of milk it delivered. Schwerz reiterated Hoffman's testimony that NFO had failed to utilize applicable provisions of the New York Uniform Commercial Code, or enter into subordination agreements with any of Nedco's other creditors.

## ARGUMENTS

NFO primarily objects to placement of its claim in Class Three. NFO argues it relied upon the 1984 and 1985 Loss Allocation Programs when it extended credit to Nedco, and thus its claim has been improperly classed with those of unsecured, non-Producer creditors who did not similarly rely on these programs. Due to this misclassification, NFO contends the Plan violates the "absolute priority rule" for it proposes to pay "the owners of Nedco before NFO's claim is paid in full". In other words, NFO asserts the Plan's proposed partial subordination scheme of Producer claims (Class Four) to the non-Producer claims (Class Three) prejudices its rights as the holder of an assumedly superior claim. Further, NFO argues Nedco has failed to prove the Plan's resolution of the interpre-

tation conflict of the Loss Allocation Programs, involving the adoption of the "compromise loss" figure, is in the best interests of creditors as a whole.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(L).

## CONCLUSIONS OF LAW

The Court recognizes at the outset its obligation to thoroughly review and carefully study the Plan, and thereafter render an informed judgment on the question of whether confirmation is in the best interests of creditors. *United Properties, Inc. v. Emporium Department Stores, Inc.,* 379 F.2d 55 (8th Cir.1967).

Code § 1129 provides the guidelines for Court confirmation of Nedco's Plan. Heading the list is the requirement that the Plan comply with the applicable provisions of Chapter 11 of the Code. Code § 1128(b) authorizes a party in interest such as NFO to object to confirmation of a plan; if an objection is sustained, the plan of reorganization cannot be confirmed. It is consequently proper for the Court to consider NFO's objections prior to reviewing Nedco's proof as to the remaining provisions of Code § 1129. *Matter of Huckabee Auto Co.,* 33 B.R. 132, 136 (Bankr. M.D.Ga.1981).

NFO's objection to confirmation was timely filed, yet Nedco and the Committee have intimated in the arguments of counsel that NFO is somehow estopped from proceeding because it had participated in the Plan's formulation as a Committee member. The Court recognizes that while Nedco is the Plan-proponent, the document is the product of the efforts of both the debtor and its very active Committee. The Committee intently scrutinized the Plan in its various stages of development, and the implications for each class of claims was the subject of various Committee meetings. While NFO had been a member of the Committee since its Court-ordered creation, and presumably had withheld its displeasure with the Plan's treatment of its claim until just prior to the filing of the Amended Disclosure, these circumstances do not bar Court review of NFO's timely filed objection. The Court is authorized to set deadlines for the filing of objections to confirmation, and when a creditor complies with the order, the Court will entertain the objections. *In re Granada Wines, Inc.,* 26 B.R. 131, 134 (Bankr. D.Mass.1983), *aff'd, Granada Wines v. New England Teamsters and Trucking Industry Pension Fund,* 748 F.2d 42 (1st Cir.1984). The Plan-proponent cannot be said to be prejudiced in this regard, since the objecting party will still bear the burden of proving the validity of the objections. *In re Silver Falls Petroleum Corp.,* 55 B.R. 495, 497 (Bankr. S.D.Ohio 1985). Once the objecting party has established reasons why the objection(s) should be recognized, the Plan-proponent bears the burden of proving that all the requirements of Code § 1129(a) have been met. *In re Hoosier Hi-Reach, Inc.,* 64 B.R. 34, 37 (Bankr. S.D.Ind.1986); *In re Agawam Creative Marketing Asso., Inc.,* 63 B.R. 612, 618 (Bankr.D.Mass.1986); *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr. S.D. N.Y.1986); *In re Trail's End Lodge, Inc.,* 54 B.R. 898, 902–03 (Bankr. D.Vt.1985). Even in the absence of a valid objection, the Court has the independent obligation to see that the Plan-proponent has complied with the provisions of Code § 1129. *In re Hoosier Hi-Reach, Inc., supra; In re Agawam Creative Marketing Asso., Inc., supra; In re Wallace,* 61 B.R. 54, 58 (Bankr. W.D.Ark.1986); *In re Prudential Energy Co., supra; In re Holthoff,* 58 B.R. 216, 218 (Bankr. E.D.Ark.1985); *In re Trail's End Lodge, Inc., supra.* Consequently, initial attention centers upon the statutory and common law underlying NFO's objections.

Code § 1129(a)(1) applies Code § 1123 to these proceedings; the former being a provision concerned directly with plan claim classification. *See,* H.R.Rep. No. 595, 95th Cong., 1st Sess. 412, *reprinted in* 1978 U.S. Code. Cong. & Ad. News, 5963, 6368 ("House Report"); S.Rep. No. 989, 95th Cong., 2d Sess. 126 *reprinted in* 1978 U.S. Code Cong. & Ad. News, 5787, 5912 ("Senate Report"). Code § 1123 sets forth man-

datory plan provisions, the absence of which results in denial of confirmation. In relevant part, Code § 1123(a) requires that a plan:

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(1), 507(a)(2), or 507(a)(7) of this title and classes of interests;

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;
. . .

In turn, Code § 1122, applicable herein by virtue of Code § 1123(a)(1), provides:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Code § 1122(a) provides NFO with the substance of its primary objection. In determining what claims are "substantially similar", Congress intended the controlling factor to be the *nature* of the similarly classed claims. House Report, *supra* at 406, U.S. Code Cong. & Ad. News at 6362; Senate Report, *supra* at 118, U.S. Code Cong. & Ad. News at 5904. As Code § 1122(a) represented a continuation of existing law, reference to cases construing § 597 (from former Chapter X) of the Bankruptcy Act of 1898 provide guidance for analysis of a plan's claim classification. Senate Report, *id.*; *Matter of Huckabee Auto Co.*, *supra* 33 B.R. at 146. In *In re Los Angeles Land and Investments, Ltd.*, 282 F.Supp. 448 (D.Hawaii 1968), *aff'd.* 447 F.2d 1366 (9th Cir.1971) (per curiam), the district court considered the classification of unsecured claims, and noted:

The test to be applied appears to be one directed toward a determination of the "nature" of the claim. This would encompass an analysis of the legal character or the quality of the claim as it relates to the assets of the debtor. Basically, it is simply a method of recognizing the rights of creditors which call for difference in treatment. Generally, however, "All creditors of equal rank with claims against the same property should be placed in the same class." *In re Scherk v. Newton*, 152 F.2d 747 (10th Cir.1945).

The courts recognize that the word "nature" is used in no technical sense in law but is used in its ordinary common vernacular, wherein it means kind, sort, species or character. Where the differences are in the rates of interest, in the amounts, in the dates of maturity, in names of payees, the manner in which the claim arose and such other minor details, they cannot affect the "nature", i.e. the kind of claim, otherwise a separate class would have to be provided for nearly every type of situation which would be an unthinkable calamity when the object and aim of the statute is regarded. (citation omitted).

Unsecured creditors may, under special circumstances, be divided into separate classes where the legal character of their claims is such as to accord them a status different from the other unsecured creditors. (citations omitted).

*Id.*, 282 F.Supp. at 453–54.

For varying reasons, some courts have held that all unsecured claims are to be singularly classified. *Granada Wines v. New England Teamsters and Trucking Industry Pension Fund*, *supra* 748 F.2d at 46 (dictum); *In re Fantastic Homes Enterprises, Inc.*, 44 B.R. 999 (Bankr. M.D. Fla.1984) ("Congress intended all unsecured claims of a similar nature to be grouped within one class, unless a separate classification is established under [Code] § 1122(b)."); *cf. In re Iacovoni*, 2 B.R. 256,

260 (Bankr. D.Utah 1980) (applying Code § 1322(b)(1)). Clearly, whenever a plan proponent has classified claims for the purpose of manipulating and defeating the Code's goal of equal treatment of similarly situated creditors, the Court may not condone classification. Thus, in two cases arising in the Bankruptcy Court for the Southern District of New York, separate classes for unsecured creditors were rejected when the court surmised schemes to produce desired voting results. *In re Mastercraft Record Plating, Inc.*, 32 B.R. 106, 108 (Bankr. S.D.N.Y.1983) *rev'd on other grounds*, 39 B.R. 654 (1984); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 831 (Bankr. S.D.N.Y. 1982).

Other courts have recognized Congressional intent to provide a flexible scheme of classification, holding that "[Code 1122(a)] does not require that similar claims *must* be grouped together, but merely that any group created must be homogenous." (emphasis in original). *Barnes v. Whelan*, 689 F.2d 193, 201 (D.C.Cir.1982).[6] In cases specifically concerned with the application of Code § 1122(a), the *Barnes* rationale has been heartily embraced. *See In re Mason & Dixon Lines, Inc.*, 63 B.R. 176, 181 (Bankr. M.D.N.C.1986); *In re Planes, Inc.*, 48 B.R. 698, 701 (Bankr. N.D.Ga.1985); *In re U.S. Truck Co., Inc.*, 42 B.R. 790, 794–96 (Bankr. E.D.Mich.1984) (dictum); *In re Huckabee Auto Co., supra* 33 B.R. at 137; *Matter of Martin's Point Limited Partnership*, 12 B.R. 721, 726 (Bankr. N.D.Ga. 1981). The Court's review of these cases reveals that primary analysis centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant. Emphasis is not upon the holder so much as it is on that which is held. Because the flexible view of classification more fully realizes Congressional intent and expectation in this area, the Court adopts the interpretation of § 1122(a) set forth in *Barnes v. Whelen, supra.*

As the court noted in *Matter of U.S. Truck Co., Inc., supra*, 42 B.R. at 794, most bankruptcy practitioners begin an analysis of unsecured claim classification from the general proposition that all are to be classed together. While in most cases this will be the common result, it is certainly not hard and fast. Thus, claims for unpaid weekly worker's compensation disability benefits have been held to have a substantially dissimilar nature than those of other unsecured trade creditors, justifying separate classification. *Id.*, at 796. The *U.S. Truck* court noted the prime *legal* characteristic distinguishing these claims from those of other unsecured creditors was that they remained "open" under Michigan state law, incapable of accurate measurement or estimate. In a separate proceeding involving the same case, the bankruptcy court authorized separate classification of union claims arising from debtor rejection of a collective bargaining agreement because of the substantially dissimilar interests involved. *Matter of U.S. Truck Co., Inc.*, 47 B.R. 932, 939–40 (E.D. Mich.1985) *aff'd, Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir.1986). Further, separate classification has been deemed appropriate for employee pension fund withdrawal liability claims due to their particularly salient legal characteristics. *In re Mason & Dixon Lines, Inc., supra* 63 B.R. at 182. It consequently appears that a number of courts have found the flexible classification approach particularly applicable with respect to unsecured claims arising out of the employer/employee relationship.

■ NFO seeks separate classification for its claim by asserting a "detrimental reliance" distinction for its unsecured claim. Other than its "reliance" upon the representations of Nedco executives, NFO can point to no other *legal* characteristic which distinguishes its claim from any of the other 124 claims in Class Three. NFO

---

**6.** *Barnes* involved classification of claims under a Chapter 13 plan. The case is relevant, however, because Code § 1322(b)(1) specifically refers to Code § 1122. *Accord, Worthen Bank & Trust Co. v. Cook (In re Cook)*, 26 B.R. 187, 190 (D.N.M.1982); *In re Moore*, 31 B.R. 12, 16 (Bankr.D.S.C.1983); *In re Kovich*, 4 B.R. 403, 405 (Bankr.W.D.Mich.1980); *In re Gay*, 3 B.R. 336, 337 (Bankr.D.Colo.1980).

has not referred the Court to any case law, either pre or post Code, which has distinguished a claim on this ground. While NFO has properly noted that general unsecured claims are not *ipso facto* subject to common classification, the recital of the rule does little to cloak NFO's claim with legal attributes warranting separate classification.

The Court's thorough review of the entire record herein leads to the conclusion that as a matter of law, NFO has failed to provide evidence sufficient to validate the objection to classification of its claim. NFO's representatives were told that the 1984 and 1985 Loss Allocation Programs would take care of Nedco's existing debt, and aid its future financial condition. As Schwerz testified, NFO specifically rejected Nedco's request for an increase in its line of credit and continued to ship milk to Nedco on an unsecured basis as it had for the previous two years. NFO never took steps to secure it claim, or sought other arrangements which would have given it priority over other Nedco creditors. The record fails to reveal NFO's "reliance" on any Nedco representations, for NFO continued to do business with Nedco as it had prior to adoption of the Loss Allocation Programs. Against Schwerz's express recommendations, NFO continued to ship milk to Nedco without somehow altering its business relationship.

A number of policy considerations underlying the Code also run contrary to NFO's demand for separate classification on the basis of detrimental reliance. A myriad of conflicting claims and allegations are foreseeable, as unsecured creditors object to plan classification of their claims based on who relied when and on what debtor representations. Were the Court to entertain such objections, the potential for fraud in Chapter 11 proceedings would be greatly enhanced. Of course, debtors are not free to misrepresent their financial standing and ability to pay in the future, or fraudulently induce creditors to act to their detriment. When a debtor has so acted, credi-

tors may seek to have the debt declared nondischargeable.[7] Should a creditor prove a debt was incurred by fraud or misrepresentation, it has established a differentiating nature warranting separate classification. What NFO seeks here is loose application of an equitable doctrine in order to give its claim a singular legal nature, and this alone will not suffice.

Second, recognition of NFO's position would render the Code's priority system meaningless, and undermine the provisions of Article Nine of the New York Uniform Commercial Code. Were NFO to be treated differently under the Plan because of professed reliance on Debtor's representations which fall short of fraud, it would be given status similar to that afforded by a "secret lien". Having failed to take steps consistent with New York State law in protecting its rights, NFO cannot now bootstrap its way to a position of priority greater than that afforded other general unsecured trade creditors. Nedco as Plan-proponent has properly placed NFO in Class Three with other creditors holding claims with substantially similar legal characteristics.

As NFO's claim has been properly grouped in Class Three, attention turns to the allegation that the Plan fails to comply with the absolute priority rule of Code § 1129(b). NFO argues the Plan is not "fair and equitable", for Producers are to receive payment before the claims of Class Three are paid in full. Because the Court holds that Code § 1129(a) or any part thereof is not to be read as mandating compliance with the absolute priority rule, NFO's objection on this ground is overruled.

■ If an impaired class of unsecured claims has voted to reject a plan, then under Code § 1129(b)(2)(B)(ii), a plan proponent may prove that a plan provides fair and equitable treatment of such a class by showing that junior claims will not receive distribution under the plan until senior claims are paid in full. NFO contends Producers are the "owners of the owners of Nedco", and thus are junior in status to the

---

**7.** Creditors may commence an adversary proceeding pursuant to Fed.R.Bankr.P. 7001 to determine a debt's dischargeability under Code § 523.

claims of general unsecured creditors. As NFO has failed in its bid for separate classification of its claim, this argument is without merit.

When all impaired classes have voted to accept a plan, Code § 1129(b) does not operate; the express terms of this section require a proponent's proof only when the requirements of Code § 1129(a)(8) have not been satisfied. The earlier Senate version of the Code had required a bankruptcy court to independently rule that a plan was fair and equitable in all instances, in addition to finding that an impaired class had accepted the plan, or that the "cram-down" provisions of the Senate version were satisfied. *See* Senate Report at 126, 1978 U.S. Code Cong. & Ad. News 5912; S.2266, § 1130(7). When the Code was adopted, this independent finding was required to be made only where an impaired class had failed to accept the plan, or a class had rejected the plan, yet was unimpaired. Cong. Rec. H11104 daily ed. (Sept. 28, 1978) (remarks of Rep. Edwards). NFO is a member of impaired Class Three. Class Three has voted to accept the Plan. Therefore, the absolute priority provisions of § 1129(b), requiring an independent finding that the plan is fair and equitable, have no place in the present proceedings. *Accord, In re Hoosier Hi-Reach, Inc., supra,* 64 B.R. at 37; *Matter of Huckabee Auto Co.,* 33 B.R. 141, 147 (Bankr.M.D.Ga.1981).

■ As an additional objection, NFO contends the Plan is not in the best interests of creditors in general, as Nedco has failed to justify the proposed compromise of litigation. As a matter of law, the Court holds this objection to be without merit, for Nedco's witnesses adequately addressed the serious unresolved legal questions raised over interpretation and enforcement of the 1984 and 1985 Loss Allocation Programs and other capital improvement programs.

Two certified public accountants gave their opinion that the term "loss", as used in the agreements, was subject to widely divergent interpretation from an accounting perspective. As the Producers and Member Cooperatives are unwilling to stipulate to a particular definition for the term, it would be necessary for Nedco to commence a lawsuit or lawsuits against those entities from which it would seek payment. Nedco's witnesses described and analyzed the differing interpretations possible as a result of any initiated court proceeding. Under the "best" set of circumstances, or enforcement of the Loss Allocation Programs to the extent of "total loss", the Producers and Member Cooperatives would wind up owing Nedco a substantial sum. Such a finding would have deleterious impact upon the dairy industry as a whole in upstate New York and elsewhere. It is probable that many of these creditors would not long survive after such a determination.

On the other hand, the litigation could result in a determination that the Loss Allocation Programs were not enforceable at all, or that the claims of Producer creditors resulted from arms-length transactions. As testified to by Hoffmeister, and as demonstrated in the recapitulations of Nedco's Amended Disclosure, either result would come at considerable expense to the estate, thus diluting the total assets available for distribution. The testimony of Nedco's witnesses revealed that the proposed compromise avoids the expenses associated with a judicial interpretation of the agreements, while at the same time resulting in enforcement of all capital improvement plans to the extent of 92% of the Debtor's operating loss. While the Court believes, based upon the evidence presented, that the term "loss" as used in the Loss Allocation Programs referenced operating loss, such conjecture cannot substitute for a judicial interpretation arrived at after consideration of the arguments of opposing counsel, and a hearing on the merits. The Plan's solution admittedly represents a compromise of the competing interests but in a manner demonstrated by Patsos, Hunt, and Reddington to maximize potential distribution to *all* creditors. Additionally, the partial subordination of Class Four claims to Class Three claims benefits non-Producer creditors, such as NFO, without resort to litigation; as discussed, this latter course of action could result in a finding

that there is no legal distinction between the claims of Classes Three and Four. From the evidence and testimony advanced by Nedco, the Court determines that the Plan's compromise of litigation is in the best interests of creditors.

With respect to the allegation that the Plan is not in the best interests of creditors in general, the standard under § 1129(a)(7) looks primarily to creditor distribution realization under a Plan greater than that to be received under a Chapter 7 liquidation. *In re Hoosier Hi-Reach, Inc.,* *supra,* 64 B.R. at 37; *In re Neff,* 60 B.R. 448, 452 (Bankr.N.D.Tex.1985); *In re Featherworks Corp.,* 25 B.R. 634, 642 (Bankr.E.D.N.Y.1982). The burden imposed on a plan proponent requires evidence, not assumptions, *In re Hoosier Hi-Reach, Inc., supra,* and Nedco has carried its burden in this regard.

Distribution under a Chapter 7 liquidation would cause further delay in payment to all creditors, and burden the estate with expenses, as liquidation is delayed until the legal obligations under the 1984 and 1985 Loss Allocation Programs are determined. The Plan provides for enforcement of these programs to the extent of approximately 92% of Nedco's "operating loss", without the associated delay. As in the case of the Debtor itself, the extended and expensive litigation required by a Chapter 7 trustee to adjudicate rights under the programs would deplete the net proceeds generated from liquidation and available for distribution. Further, as the evidence indicates, it is conceivable that the result of any litigation could be a determination that the Loss Allocation Programs are unenforceable, thus reducing the assets available under a Chapter 7 liquidation. The various considerations and concerns of both Nedco and the Committee in reaching the Plan's compromise solution were addressed by the witnesses at the hearing, and further divulged in the Amended Disclosure. The evidence indicates that Nedco's creditors will receive greater payment on their claims under the Plan, in a shorter period of time, than under liquidation conducted by a Chapter 7 trustee. Consequently,

from the evidence presented, a finding that the Plan is in the creditors' best interests is warranted.

At various times, NFO has additionally raised objections concerning 1) claim dispute resolution; 2) renunciation of the Loss Allocation Programs; and 3) payment distribution under the Plan. NFO failed to substantiate the validity of these objections, and Nedco's proof revealed each consideration to be properly addressed within the parameters of the Code. In light of the foregoing, these objections of NFO are also rejected.

As to Nedco's requested confirmation of the Plan, the Court holds as a matter of law:

1) The Plan complies with the applicable provisions of Title 11 of the United States Code.

2) Nedco has proposed the Plan in good faith, and not by any means forbidden by law. Nedco has further complied with all applicable provisions of Title 11 of the United States Code.

3) All payments made or promised to be made by Nedco for services or for costs and expenses in connection with the Plan, and incident to the case have been fully disclosed to the Court and are reasonable. Where the same are to be fixed after confirmation, the Court's approval will be necessary.

4) The identity and affiliations of persons who are or may be directors or officers or trustees if any, of Nedco after confirmation have been fully disclosed. The appointment of such persons to such offices is equitable and consistent with the interests of creditors and with public policy. The identity of any insider to be employed by Nedco, and his compensation, has been fully disclosed.

5) The Plan does not provide for any changes in rates over which any regulatory commission has jurisdiction.

6) With respect to each class, each holder of a claim or interest of such class has either accepted the Plan or will retain under the Plan on account of such claim or interest property of a value, as of the

Plan's effective date, that is not less than the amount that such holder would receive or retain were Nedco liquidated under Chapter 7 of the Code on such date. The record reflects that Nedco's estate would bear the burden of the cost and expense associated with litigation over the legality and ultimate legal effect of the 1984 and 1985 Loss Allocation Programs and other capital programs, which would reduce the amount to be received by creditors under Chapter 7 liquidation.

7) The Plan provides that the expenses associated with administration of the estate, specified in Code § 507(a)(1) or § 507(a)(2), allowed as of confirmation shall be paid in full, in cash, on the effective date or such later date as such claims are finally allowed.

8) Classes Three, Four, Five and Six are impaired under the Plan, and each have accepted the Plan. Acceptance by each impaired class was determined without including the acceptance of the plan by any insider holding a claim in such class.

9) At the hearing of December 3, 1986, NFO and Nedco presented evidence on NFO's objections to the Plan's confirmation. After carefully considering the record in this case, and the testimony elicited, the Court concludes the Plan is feasible, and in the best interests of creditors. Confirmation of the Plan is not likely to be followed by liquidation or the further financial reorganization of Nedco.

10) The Plan provides for the liquidation of substantially all of the property of the estate; Code § 1141(d)(3) is thus applicable.

As a consequence of the foregoing, it is ORDERED:

1. The objections of NFO to confirmation of the Second Amended Plan of Reorganization are denied in their entirety.

2. The Second Amended Plan of Reorganization for Northeast Dairy Cooperative Federation, Inc. filed by the debtor-in-possession on June 2, 1986 is confirmed.

3. The Court shall retain jurisdiction of this matter for all purposes set forth in Section VI of the Second Amended Plan of Reorganization, including, without limitation, jurisdiction to allow and disallow claims arising prior to the date of this Order and jurisdiction to hear and determine all controversies existing as of the date hereof.