**In re VALLEY PARK GROUP, INC., Debtor.**

**Bankruptcy No. 87–01087.**

United States Bankruptcy Court, N.D. New York.

Jan. 4, 1989.

O'Hara & Crough, Syracuse, for debtor; Craig P. Niederpruem, of counsel.

Welch, Welch & Carr, P.C., Syracuse, for Richard D. Hovey and Truax & Hovey, Ltd.; Anthony P. Adorante, of counsel.

Kim F. Lefebvre, Albany, Asst. U.S. Trustee.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

This matter comes before the Court on the objections to the confirmation of the reorganization plan of Valley Park Group, Inc. ("Debtor") and the request for conversion to a liquidation proceeding by Truax & Hovey, Ltd. and it's president, Richard D. Hovey ("Hovey"), in his individual capacity. After an adjourned confirmation hearing was conducted on June 22, 1988 in Utica, New York, the Court reserved decision.

### JURISDICTIONAL STATEMENT

The Court has jurisdiction over the subject matter and the parties by virtue of 28 U.S.C.A. §§ 1334(b) and 157(a) (West Supp. 1988). This is a core proceeding, 28 U.S.C.A. § 157(b)(1) and (b)(2)(A), (L) and (O), governed by Rules 1017(d), 2002(a), 3003, 3007, 3017, 3018, 3020(b) and 9014 of the Bankruptcy Rules ("Bankr.R."). The following constitutes findings of facts and conclusions of law pursuant to Bankr.R. 7052.

### FACTS

The Debtor is a closely-held New York corporation in the business of developing a certain residential subdivision of real property, consisting of six single family residences situated on seven building lots, in Adams, Jefferson County, New York. Its primary source of financing, commencing in August 1985, had been from Key Bank of Northern New York N.A. ("Key Bank") and was secured by a mortgage on the real property in Adams.

Sometime between late January and late February of 1987, Key Bank assigned the Debtor's mortgage to Hovey for the sum of $250,000.00. Key Bank's internal records indicate that Hovey actually purchased its rights in a foreclosure action for $250,-000.00 on January 29, 1987. *See Objection to Chapter 11 Plan* (rec'd and filed June 3, 1988) (Letter from Robert L. Recore, Vice–President of Key Bank to Anthony P. Adorante, Esq. at p. 1 of attached Interest Calculation sheet (Jan. 19, 1988)). Hovey's efforts to sell the mortgage to the Debtor for $325,000.00 or to settle all liability by having the Debtor sign over the project to him were apparently unsuccessful, as were the Debtor's own attempts to buy Hovey out.

On May 21, 1987, the Debtor voluntarily filed a petition pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C.A. §§ 101–1330 (West 1979 & Supp.1988) ("Code"). This case, No. 87–00717, was thereafter

dismissed without prejudice on July 15, 1987 for the Debtor's failure to file required documents pursuant to Bankr.R. 1007. On August 3, 1987, the Debtor filed a second voluntary petition under Chapter 11, listing debt and assets of $860,296.00 and $705,000.00, respectively, in schedules A and B filed August 24, 1987. The Court set January 20, 1988 as the bar date for filing proofs of claims.

The sole entry in the Debtor's Schedule A–2, "Creditors Holding Security", listed Hovey as the holder of a claim secured by a mortgage obtained February 11, 1987 and "incurred August 1985 through June, 1987, including principal and interest as provided in original document with Key Bank who assigned/sold to Hovey for $250,000." Hovey's claim was described as unliquidated and bearing a market value of $325,000.00. The petition further indicated Hovey's claim amounting to $462,000.00 "without deduction of value of security."

Truax & Hovey, Ltd. was listed in the Statement Of Financial Affairs For Debtor Engaged In Business, attached as Exhibit 1 to Schedules A and B, as a lienor in the aggregate amount of $22,987.01 for five subdivision lots. On Item 10 of the same Statement Of Financial Affairs, the Debtor answered "None" in response to a question concerning prior bankruptcy proceedings brought by or against it.

Hovey filed a proof of claim on January 13, 1988 which set forth $484,000.00 as the amount due based upon his status as "the Assignee and holder of a Note and Mortgage given by the Debtor to Key Bank of Northern New York." The proof of claim also indicated that Hovey held a first mortgage on all of the real property owned by the Debtor and attached part of a consolidation and modification agreement entered into on November 8, 1985 between Key Bank and the Debtor for a loan of $450,-000.00.

Truax & Hovey, Ltd. filed a proof of claim on January 13, 1988, which indicated a debt of $21,700.00, including interest to January 11, 1988, from the unpaid balance due on mechanic's liens for improvements on the Debtor's real property. The proof of claim attached copies of the mechanic's liens, a Promissory Note/Grid Note dated October 15, 1985 for $450,000.00 and signed by the Debtor's President, Paul C. Dubriske ("Dubriske"), and two mortgages dated October 17, 1985 and August 15, 1985 between the Debtor and Key Bank covering the "Valley Park Subdivision" in Adams.

In an Order dated October 19, 1987, the Court denied, without prejudice, the motion of Hovey and Truax & Hovey, Ltd. to lift the automatic stay. Said Order, in pertinent part, found Hovey's interest to be adequately protected for purposes of the requested stay relief under Code § 362(d)(1) by an "equity cushion" representing the difference between the $509,-000.00 appraised value of the property and the $250,000.00 purchase price of the Key Bank mortgage. The Order also directed the Debtor to set up a separate interest-bearing bank account for the deposit of proceeds from all subdivision sales, less attorney and realtor fees and closing costs, and prohibited withdrawals without further Court approval.

The Debtor filed its first Disclosure Statement and Plan on January 19, 1988, which contemplated a reorganization through the sale of current and future inventory—the six existing houses and those yet to be constructed—and loans from Dubriske and classified the creditors into six classes. *See Chapter 11 Plan* at Articles II, III, IV (Jan. 15, 1988).

An Order dated February 5, 1988 gave notice of the March 8, 1988 Disclosure Statement hearing to the "Debtor, creditors, equity security holders (or stockholders) and parties in interest." Hovey filed timely objections on March 3, 1988, as did the engineering firm of Bernier, Peck, Gozalkowski & Carr, also a creditor, on March 4, 1988. The hearing was adjourned to March 15, 1988 and thereafter, on March 14, 1988, an objection was filed by Truax & Hovey, Ltd.

The Debtor's First Amended Disclosure Statement, filed on March 30, 1988, was approved by the Court in an Order dated

April 13, 1988, subsequent to the second adjourned hearing on April 5, 1988.

This amended Disclosure Statement identified Dubriske as the Debtor's sole equity security holder, director and officer. *See First Amended Disclosure Statement* at ¶ 2.01 (Mar. 24, 1988). It indicated that the Debtor's unsecured debt of $385,899.00, as listed in its schedule, had been "determined" to be $215,855.00 and that amended schedules reflecting this change were to be filed. *See id.* at ¶ 3.06(a).

The Disclosure Statement described sharing a "brother-sister" relationship, for tax purposes, with its largest unsecured creditor, Planned Construction Developers, Inc. ("PCD"). *See id.* at p. 8. PCD was identified as a New Hampshire corporation formed by Dubriske, also its principal and sole shareholder, to develop new projects in its state of incorporation and to operate the New York state projects, because the Debtor "was not actively operating but rather only a holding company." *See id.* The Debtor also disclosed that PCD had stepped into the shoes of the R.M. Buck Corporation as general contractor and had assumed the latter corporation's accounts payable, which accounted for PCD's claim against the Debtor of $194,958.00. *See id.* The Disclosure Statement further stated that PCD had filed for Chapter 11 relief in New Hampshire on February 8, 1988. *See id.*

The Debtor also represented that it would continue to file monthly operating reports with the Court, as it had from September through December 1987, and that the operating reports included "a statement of receipts from all sources classified as to source; an itemized statement of all disbursements and a corporate balance sheet." *Id.* at ¶ 5.02.

The Plan attached copies of statements and schedules from the Debtor's original business plan involving sixty-three houses and a tennis and pool club as well as a revised pro-forma operating statement and balance sheet, dated December 31, 1987, projecting a profit of $164,277.00 from the sales of the existing six house inventory and the construction of thirteen new houses. *See Chapter 11 Plan, supra,* at 22–28 (Exhibits A and B). A statement of operations for the period August through December 1987 showed "O" in revenue earned and a net loss of $17,285.00. *See id.* at 31 (Exhibit D). The Plan projected net proceeds of $485,000.00 from the sale of the existing inventory of the six houses and one lot. *See id.* at 34, 33 (Exhibit D). An accompanying schedule set forth the "intended" disbursements of the net sales: $225,000.00 towards Hovey's mortgage and interest with the balance of his claim secured by an additional mortgage on land yet to be purchased, $105,000.00 to trade payables (constituting forty-two percent payment of total unsecured debt of $249,-000.00), $30,000.00 for general construction, $50,000.00 for working capital and $75,000.00 for land acquisition. *See id.* at 34, 35 (Exhibit D).

The Plan envisioned using part of the proceeds from the existing houses to purchase more real estate and build additional houses. Five of the six classes were to receive distributions under the Plan with Class One claims, the Code § 503(b) administrative expenses, excluding the fees of the United States Trustee ("UST"), to be "paid currently in the ordinary course of the Debtor's business." *Id.* at ¶ 3.01. Class Two, the UST's fees, were to be full cash payments "upon the Distribution Date" and Class Three, the priority tax claim of the Town of Adams, were to be made from the sale proceeds of each house.[1] *Id.* at ¶¶ 3.02, 3.03. Unsecured Creditors, Class Five, were to be paid forty-two percent of their claims "upon the Distribution Date." *Id.* at ¶ 3.07. Class Six consisted of Dubriske's allowed claims and enabled him to "retain [his] lien to the extent of the amount of such Class 6 Claim" until the completion of five equal

---

1. In the Debtor's Schedule A–1, "Creditors Having Priority", the Town of Adams was listed as the holder of a claim for 1986 property taxes in the amount of $9,407.00. On October 7, 1987, the County of Jefferson filed a proof of claim in the amount of $11,212.64 for county, town and school taxes.

annual installments in cash beginning on January 1, 1989. *See id.* at ¶¶ 2.06, 3.08.[2]

Hovey's claim, categorized as Class Four, was valued at $275,000.00, which included the amounts of $250,000.00, the price at which he purchased the mortgage from Key Bank in February 1987, $15,000.00 of interest and $10,000.00 attributed to the mortgage acquisition cost. *See id.* at 4.02(B)(1). The Plan proposed to provide Hovey's claim with twelve percent interest from "the date of reorganization" and for payments to commence from the proceeds of the second and subsequent houses sold. *See id.* at ¶¶ 3.04, 4.02(B)(1).

Pursuant to an Order dated April 19, 1988 notice of the May 26, 1988 hearing date for confirmation of the Plan was disseminated to the same parties noticed in the Disclosure Statement. It included copies of the Plan and approved Disclosure Statement as well as a ballot for accepting or rejecting the Plan.

At the confirmation hearing on May 26, 1988, there were five ballots rejecting the Plan and none accepting it on file with the Clerk of the Court.[3] The sole written objection, filed on the day of the confirmation hearing, belonged to the UST and was based upon the Debtor's non-payment of its statutory fees. It demanded payment within ten days of the entry of the confirmation order with adequate assurance of future cash payments. The Court adjourned the hearing until June 22, 1988 to give Hovey, who had appeared by counsel with oral objections, the opportunity to file written objections.

In papers filed June 3, 1988, Hovey and Truax & Hovey, Ltd., by single counsel, combined their four objections to the Debt-

or's Plan: 1) to the characterization and valuation of Hovey's claim, 2) to the failure to address the disposition of certain trust fund assets under the New York Lien Law alleged to have been transferred to PCD, 3) to the treatment of the holders of mechanic's liens as general unsecured creditors instead of holders of subordinate secured interests and 4) to Dubriske's monthly salary of $3,000.00. *See Objection To Chapter 11 Plan* (received and filed June 3, 1988) (unsigned). They also submitted that the Debtor's Chapter 11 case should be converted to a Chapter 7 proceeding and that the stay affecting the state court foreclosure proceedings be vacated. *See id.* at 4.

At the adjourned confirmation hearing on June 22, 1988, no further acceptances, rejections or objections to the Plan had been filed, save for those of Hovey and Truax & Hovey, Ltd. Additionally, Debtor's counsel represented that two of the six completed houses had been sold and maintained that the Plan hinged on valuing Hovey's claim at $275,000.00. Debtor's counsel further stated that the Plan could not go forward if Hovey's claim was valued at $500,00.00. The parties stipulated to the amount due on the mortgage owned by Hovey as $509,342.10, including a principal of $409,816.47 and interest through June 22, 1988 of $99,525.63, without Debtor's counsel conceding that to be Hovey's entitlement. The Court took the objections to the Plan's confirmation and the request for conversion to Chapter 7 under advisement.

To date, the Debtor has not filed any operating reports.

In Orders dated February 26, 1988 and October 19, 1988, the Court approved the

---

2. The Debtor's Schedule A–3, "Creditors Having Unsecured Claims Without Priority", listed Dubriske as the holder of a claim for $10,034.00, arising from an officer loan on December 6, 1985. Schedule B of the amended Disclosure Statement indicated the claim as "$23,213 Officer loan for working capital." Additionally, in an Order dated January 22, 1988, the Court authorized the Debtor to borrow $15,000.00 from Dubriske and granted the latter a priority on the Adams real property behind Hovey's mortgage and the mechanic's liens held by Truax & Hovey, Ltd.

3. The five timely rejections were 1) Bernier, Peck, Gozalkowski & Carr for an unspecified claim, 2) New York State Department of Tax & Finance for a priority claim in the amount of $521.72, 3) Truax & Hovey, Ltd. for a $20,000.00 unsecured claim, 4) Truax & Hovey, Ltd. for a $20,000.00 unpaid mechanic's lien and 5) Hovey for a $409,000.00 claim representing "bond & 1st mortgage on real property."

sale of three lots with houses and directed the proceeds to be held in the interest-bearing bank account created pursuant to the Order dated October 19, 1987.

## DISCUSSION

■ While the objectants' success on their request for conversion to Chapter 7 would render the objections to the confirmation of the Debtor's Plan moot, the Court notes that this request was informally made in objection papers neither noticed or served, and then in open court at the adjourned confirmation hearing on June 22, 1988. The governing statute, Code § 1112(b), requires "notice and a hearing", explained by Code § 102(1) as that which is appropriate under the particular circumstances. Code § 102(1)(B) further allows the actual hearing to be dispensed with if notice is "properly given" and a party in interest does not timely request a hearing or there is insufficient time for the hearing to be conducted prior to the requested relief and the court authorizes said act. *See In re Providence Television Ltd. Partnership*, 75 B.R. 139, 140 (Bankr.N.D.Ill.1987) (court has broad discretion under Code § 1112(b) to schedule a hearing); *In re Jartran, Inc.*, 71 B.R. 938, 943 (Bankr.N.D. Ill.1987). *But see* Bankr.R. 2002(a)(5) (twenty-day notice to parties in interest of hearing on conversion). Bankr.R. 1017(d) further instructs that dismissal or conversion proceedings are contested matters initiated by motion, as set forth in Bankr.R. 9014, which directs that "reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought."

"The essential command of § 1112(b) is that the court and all parties concerned be placed on notice of the nature of the motion and the identity of the movant." *A. Illum Hansen, Inc. v. Tiana Queen Motel, Inc. (In re Tiana Queen Motel, Inc.)*, 749 F.2d 146, 149 (2d Cir.1984). Without this notice to all parties in interest and the potential feedback as a result thereof, the Court is unable to fulfill its statutory duty to determine whether conversion, or dismissal, would be in the best interest of the creditors and the estate. *See* 5 L. King, COL-

LIER ON BANKRUPTCY ¶ 1112.03[2][a], [b] (15th ed. 1988).

No such notice was given here and, indeed, it appears that only the Court, the Debtor and the objectants were aware of the pending "request" for conversion through the objection papers, to the exclusion of the Debtor's eighteen other creditors, including seven entities holding mechanic's liens, and the United States Trustee. This is so notwithstanding any actual notice PCD might have been privy to through Dubriske. Moreover, the notice of the disclosure or confirmation hearings, sent to the twenty-one entities listed on the mailing matrix, contained no specific notice that the Court would consider conversion to Chapter 7 liquidation when it ruled on the plan's confirmation. *See, e.g., In re Stuart Glass & Mirror, Inc.*, 71 B.R. 332, 334 (Bankr.S.D.Fla.1987). While the Court may be inclined in certain situations to treat informal requests as motions when due process requirements are satisfied, it cannot do so in the absence of such compliance, as here.

■ Consequently, the Court can only consider the four objections to the Plan raised by Hovey and Truax & Hovey, Ltd., which appear aimed at good faith, feasibility and improper classification pursuant to Code §§ 1122, 1129(a)(1), (3) and (11), as well as the Plan's general compliance with Code § 1129. The Court cannot confirm a Chapter 11 plan unless the fourteen requirements in Code § 1129 are met and the burden of proof falls upon its proponent. *See In re Future Energy Corp.*, 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988) (citations omitted); *In re Northeast Dairy Cooperative Federation Inc.*, 73 B.R. 239, 248 (Bankr.N.D.N.Y.1987); COLLIER ON BANKRUPTCY, *supra*, ¶ 1129.01[1]. An objecting party only initially bears the burden of proving the validity of the objections and must set forth adequate reasons. *See In re Future Energy Corp., supra*, 83 B.R. at 482 n. 21 (quoting *In re Northeast Dairy Cooperative Federation Inc., supra*, 73 B.R. at 248). However, the Court has an independent duty to insure that the

plan-proponent has complied with Code § 1129, which includes the mandatory provisions of Code § 1123(a), even absent valid objections. *See id.*

Thus, before reaching the aforementioned filed objections, the Court will proceed to scrutinize the Plan against Code § 1129(a), the "acceptance method", given the absence of a motion pursuant to Code § 1129(b). *See* B. Weintraub & A. Resnick, BANKRUPTCY LAW MANUAL ¶ 8.23[1]–[3] (rev. ed. 1986 & Supp.1988).

■ At the outset, neither the Plan nor the Disclosure Statement make any mention of impairment with respect to each class. *See* Code § 1124. This is a prerequisite to determining the necessity of class acceptances under Code §§ 1126 and 1129(a)(8) and in contravention of Code § 1123(a)(2) and (3) and Code § 1129(a)(1). *See also* COLLIER ON BANKRUPTCY, *supra*, ¶ 1129.02[1]. Generally, since bankruptcy accelerates all of the debtor's debts, any alteration of the legal, equitable or contractual pre-petition rights of the holder of a claim constitutes impairment, subject to the three "exceptions" in Code § 1124. *See* Bienenstock, Martin J., BANKRUPTCY REORGANIZATION 591–597 (1987); BANKRUPTCY LAW MANUAL, *supra*, at ¶ 8.19[2][b]. *See, e.g., Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 787 F.2d 1352, 1363 (9th Cir.1986) (plan's modification of debtor's articles and by-laws divesting shareholders of ability to vote for directors is impairment); *In re Barrington Oaks General Partnership,* 15 B.R. 952, 956 (Bankr.D.Utah 1981) (plan's change of obligors alters rights set forth in loan document and constitutes impairment).

Code § 1129(a)(9) mandates the treatment of Code § 507 priority claims, which comprise Classes One (administrative expenses), Two (UST fees) and Three (Town of Adams taxes) of the Plan. Unless the holder arrives at a different agreement with the debtor, Code § 1129(a)(9)(A) and (B), concerning Code § 507(a)(1) to (6) claims, contemplate acceptance or unimpairment within the explicit meaning of Code § 1124(3)(A) while Code § 507(a)(7) claims allow a "present value" variant of

Code § 1124(3)(A) in deferred cash payments over a period not to exceed six years. Thus, any other treatment of priority claims is impermissible and constitutes impairment, triggering the need for acceptance under Code § 1126(c) by the impaired class. Similarly, if any other classes or interests are altered within the meaning of Code § 1124, their acceptance is necessary under Code § 1129(a) for plan confirmation.

■ The record, as indicated, is devoid of any agreements with the Debtor or acceptances by members of Classes One, Two or Three. Neither does it disclose an understanding between the Debtor and the UST that the latter's fees would be paid within ten days of the entry of the confirmation order, as proposed in the UST's objection papers.

The Plan instead proposes to pay Class One outside of the Plan and in the ordinary course of the Debtor's business and to pay Class Two in cash or on other terms as the holder might agree on an unspecified "Distribution Date." Both treatments conflict with the statute's directive that such holders be paid cash equal to the allowed amount of the claim on the effective date of the Plan. *See* Code §§ 1129(a)(9)(A), 1124(3)(A). As for Class Three, payment is contemplated "from the proceeds of the sale of each house." The open-ended time frame this payment could conceivably encompass and the Plan's silence with regard to a discount rate does not address Code § 1129(a)(9)(C)'s requirement that distribution be in deferred cash payments not to exceed six years from the date of assessment and be equal to the "present value" of the claim's allowed amount on the effective date of the plan. Hence, Classes One, Two and Three are impaired.

The Court also finds that Classes Four through Six are impaired within the meaning of Code § 1124, since the Plan changes each claims' rights with regard to the size and timing of payment and does not propose to treat the claims in accord with Code § 1124(2) or (3).

The Court notes that at the adjourned confirmation hearing there were still only five ballots, all rejecting the Plan. The

absence of any acceptances, mandated by the impaired status of all six classes, is fatal to the Plan's confirmation under Code § 1129(a). Even if the Debtor had moved for "cramdown" pursuant to Code § 1129(b), the acceptance of one impaired class pursuant to Code § 1129(a)(10), with the exception of the insider Dubriske in Class Six, would still be required. *See id.* at ¶ 8.23[1]. *See also Heins v. Ruti–Sweetwater, Inc. (In re Ruti–Sweetwater, Inc.),* 836 F.2d 1263 (10th Cir.1988).

■ The Plan's rosy sales projections pursuant to the revised building plan are suspect, especially given the Debtor's inactivity and net operating loss from August through December 1987. With nothing more recent in the record to substantiate its optimistic analyses, such as clear proof of the executed sales of the three houses and the maintenance of the interest-bearing bank account, the Court can only conclude that the Plan is a visionary scheme that does not provide adequate means for implementation pursuant to Code § 1123(a)(5). Nor is the Court convinced that confirmation will not likely be followed by liquidation or the need for further financial reorganization pursuant to Code § 1129(a)(11).

The Court further notes the absence of a liquidation analysis satisfying the "best-interest-of-creditors test" under Code § 1129(a)(7).

■ Moreover, the absence of monthly operating reports on file with the Court, in contrast to the apparently erroneous assertion in the Disclosure Statement to the contrary, violates the Order dated August 10, 1987 promulgated under Code § 1106(a) and Bankr.R. 2015(a)(3), and implicates Code § 1129(a)(2). *See also* Bankr.R. X-1007(b). As a fiduciary of the Court, the Debtor has an obligation to provide basic financial information to its creditors and neither the Court nor the creditors should have to coerce it into doing so while it is under the protection of the Code. *See In re McClure,* 69 B.R. 282, 289–290 (Bankr. N.D.Ind.1987); *In re Bacon,* 52 B.R. 52, 54 (Bankr.N.D.Iowa 1985).

Anything short of voluntary and honest disclosure obstructs the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess., 224, 408–409, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6183–84, 6364–6365. A transgression of this nature also calls into question the Debtor's good faith, required under Code § 1129(a)(3), an impression bolstered by the negative and patently untrue response in its petition about prior bankruptcy proceedings, its unfulfilled promise in the amended Disclosure Statement to file amended schedules reflecting a smaller amount of unsecured debt (a figure inconsistent with the differing representations in both the petition and the Plan), the interlocking relationship the Debtor apparently shares with PCD and the Plan's questionable treatment of Dubriske, its only insider.

Furthermore, the Plan does not satisfy Code § 1129(a)(12), which requires that the UST's unpaid fees, pursuant to 28 U.S.C.A. § 1930 (West Supp.1988), be paid in cash on the effective date of the plan. The statute does not sanction cash payments on some unexplained "Distribution Date" as provided for in the Plan.

Thus, without even reaching the validity of the objections filed by Hovey and Truax & Hovey, Ltd., the Court must conclude that the Plan, as filed, fails to meet nine of the twelve applicable requirements under Code § 1129(a), precluding confirmation.

■ The Court might observe, however, that the objections concerning the valuation of Hovey's claim and the unsecured treatment of the mechanic's liens appear to have merit, albeit perhaps premature at this juncture, and supported by the barest of explanations. Suffice it to say, that valuation for the purposes of determining adequate protection in the context of a motion to lift the automatic stay made early in the case, as here where the notice of motion was filed eight days after the case was commenced, is geared to temporarily providing the Debtor with the maximum "breathing space" necessary to launch its reorganization. *See In re 6200 Ridge, Inc.,*

69 B.R. 837, 843 (Bankr.E.D.Pa.1987); *Empire Enterprises, Inc. v. Koopmans (In re Koopmans)*, 22 B.R. 395, 404 n. 17 (Bankr. D.Utah 1982).

 Hence, such valuation cannot bind the Court almost seventeen months later with regard to the fixing of the allowed amount of claims in a plan which will establish new rights and obligations and permanently supplant those entered into prepetition upon the confirmed plan's substantial consummation. *See* Code §§ 506(a), 1141(a), 1127, 1101(2); COLLIER ON BANKRUPTCY, *supra*, at ¶ 1141.01[1]; BANKRUPTCY REORGANIZATION, *supra*, at 590. *See generally United States v. Standard State Bank*, 91 B.R. 874 (W.D.Mo.1988). "Confirmation of the plan marks the beginning of the reorganized debtor's new financial life. New legal relationships are established and old ones are modified or terminated." BANKRUPTCY LAW MANUAL, *supra*, at ¶ 8.23[5] at 8–118.

Moreover, Bankr.R. 3003(c)(4) instructs that Hovey's timely filing of a proof of claim superceded its listing in the Debtor's Schedule A–2 and shifted the burden of contesting the claim's amount to the Debtor pursuant to Bankr.R. 3007. The absence of any such action by the Debtor in the record establishes the amount of Hovey's claim as that indicated on his proof of claim. *See* Code §§ 501(a), 502(a).

Likewise, a mechanic's lien "secures priority of payment of the price or value of work performed and materials furnished in erecting or repairing a building or other structure, and as such attached to the land as well as buildings and improvements erected thereon." BLACK'S LAW DICTIONARY 885 (5th ed. 1979) (emphasis added). *See also* Code § 101(4), (33). The holders of mechanic's liens hold claims markedly different from the claims of the unsecured trade creditors and should be treated by and classified in the Plan accordingly. *See* Code §§ 1122(a), 1123(a), 1129(a)(1).

By virtue of the foregoing, it is

ORDERED:

1. That confirmation of the Debtor's Chapter 11 plan is denied without prejudice.

2. That Hovey and Truax & Hovey, Ltd.'s request for conversion to Chapter 7 is denied without prejudice.